JD:TH
F.#2016R01076

**16 M 0338**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ALI NAGI and
MELQUIADES EVARISTO GARCIA-AMBROCIO,

                  Defendants.

TO BE FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
APPLICATION FOR
ARREST WARRANT

(T. 18, U.S.C., §§ 2, 641)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        ELIZABETH GREANEY, being duly sworn, deposes and states that she is a

Special Agent with the United States Department of Agriculture, Office of Inspector General

("USDA-OIG"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between September 2014 and

September 2015, both dates being approximate and inclusive, within the Eastern District of

New York and elsewhere, the defendants ALI NAGI and MELQUIADES EVARISTO

GARCIA-AMBROCIO, together with others, did embezzle, steal, purloin, and knowingly

convert to their use or the use of another, and without authority, sell, convey, and dispose of

a record, voucher, money, or thing of value of the United States or of any department or

agency thereof, to wit: the United States Department of Agriculture, Food and Nutrition

Service.

        (Title 18, United States Code, Sections 2 and 641)

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.     I am a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG") and have been a Special Agent with USDA-OIG since January 2011.  I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal food stamp benefit offenses in the United States.  I have attended training at the Federal Law Enforcement Training Center in Glynco, Georgia, and obtained a Master of Science degree in Forensic Science.  Working as a Special Agent, I have been involved in numerous investigations relating to food stamp benefit fraud, food stamp benefit trafficking and other violations of federal law, including violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Sections 371, 641 and 1343.  These investigations are conducted both in an undercover and overt capacity.  During the course of these investigations, I have conducted surveillance, executed search warrants, debriefed witnesses and reviewed documents related to fraud schemes.  I have received training in various investigative techniques including, but not limited to, the execution of search warrants.  I have participated in investigations involving search warrants and arrest warrants.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, I have not set forth each and every fact learned during the course of the investigation.

2

2.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from my own observations, reports made to me by other law enforcement officers and review of records from USDA-OIG and other government agencies.  In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

3.      USDA-OIG is investigating unlawful food stamp benefit fraud. Specifically, USDA-OIG is investigating individuals and entities that unlawfully process food stamp benefits without being authorized to do so by the USDA and unlawfully exchange cash for food stamp benefits.

## BACKGROUND

A.      The "SNAP" Program and Authorized Retailers

4.      The federal government, through the United States Department of Agriculture, Food and Nutrition Service ("FNS"), administers the Supplemental Nutrition Assistance Program ("SNAP").

5.      SNAP was formerly called and known as the "Food Stamp Program." SNAP utilizes federal tax dollars to subsidize low-income households, affording such households the opportunity to achieve a more nutritious diet by increasing their food-purchasing power.  SNAP is the new name of the Food Stamp Program, as a result of the Food, Conservation, and Energy Act of 2008 (P.L. 110-246), also known as the Farm Bill.  The new name, effective October 1, 2008, more accurately reflects the program's mission to provide food assistance and nutrition education to assist participants as they move to a healthier lifestyle and self-sufficiency.

3

6.     In New York, individuals who receive SNAP benefits ("Recipients") no longer redeem their benefits by using paper food stamps coupons.  Recipients now redeem their SNAP benefits electronically through the use of what is known as an Electronic Benefits Transfer ("EBT") card.  The SNAP EBT cards operate much like automated teller machine (ATM) cards used by banks.  At the beginning of each month, a Recipient's EBT card is credited with a dollar amount of food stamps benefits for that month.

7.     The EBT cards are used by Recipients to purchase eligible food items at retail food stores ("retailers") that are authorized by FNS to participate in SNAP and have EBT terminals located in the stores.  As a purchase is made, the retailer runs the EBT card through the EBT terminal.  The Recipient enters a personal identification number ("PIN") on a keypad, and the amount of the purchase is deducted from the Recipient's EBT card.  The EBT terminal generates a receipt for each transaction, and the balance remaining in the Recipient's account for the month is displayed on the receipt.  The amount of the Recipient's purchase is then electronically credited to the retail food store owner's bank account, via previous arrangements between the retailer or representative and the FNS.

8.     SNAP benefits may be accepted by authorized retailers only in exchange for eligible food items.  According to FNS regulations, most edible items, with the exception of prepared foods, vitamins, and medicines, are eligible for purchase with SNAP benefits.  Items such as beer, cigarettes, paper goods, and soaps are not eligible for purchase with SNAP benefits and it is a violation of the rules and regulations governing SNAP to allow SNAP benefits to be used to purchase ineligible items.  SNAP benefits may not lawfully be exchanged for cash under any circumstances.  Exchanging SNAP benefits for cash is known as "trafficking," and is a violation of the rules and regulations governing

4

SNAP. Lastly, retailers may not permit Recipients to run credit accounts and pay off such accounts with SNAP benefits from their EBT cards. Doing so is a violation of the rules and regulations governing the SNAP.

9.      All retailers, prior to receiving authorization to participate in SNAP and to process EBT transactions for Recipients, must submit to FNS an Application for Authorization to Participate in SNAP. By executing the application, the applicant attests that he has read the Warnings & Certification that is sent to retailers along with the application documents. The Warnings & Certification provides that, by his/her signature on the application, the applicant is attesting to understanding that he/she, and the persons on behalf of whom the application is submitted, are responsible for ensuring that all employees at the store, both paid and unpaid, comply with SNAP rules and avoid engaging in unauthorized activity, that SNAP authorization may not be transferred to new owners, partners, or corporations, that an unauthorized individual or firm accepting or redeeming SNAP benefits is subject to substantial fines and administrative sanctions, and that violations of SNAP rules can result in criminal prosecution and sanctions. This application, the truthfulness of which must be affirmed by the applicant, also requires the applicant to disclose certain information about the applicant's store to FNS so FNS can determine whether the applicant is eligible to participate in SNAP. The required information includes, inter alia, the store's actual or estimated annual gross sales and food sales, the types of products sold, the number of individuals employed, the quantity and type of cash registers used, and the bank account designated to deposit all SNAP proceeds. All applicants also receive training from FNS regarding proper conduct as a participating retailer in SNAP. The training makes clear that SNAP prohibits exchanging SNAP benefits for cash and selling ineligible items.

5

10. SNAP benefits may be accepted only by retailers authorized to participate in SNAP by FNS. Once FNS authorizes a retailer to accept SNAP benefits, FNS issues the retailer a SNAP permit and a unique authorization number (the "FNS authorization number"). FNS uses the FNS authorization number to identify the retailer and track redemptions. A retailer that does not possess a SNAP permit and FNS authorization number may not accept or redeem SNAP benefits. Each store location must have a separate SNAP permit. If a store changes ownership, moves, or closes, its SNAP permit is void. A SNAP permit is not transferable.

11. A typical legitimate transaction, utilizing an EBT card, would occur as follows: an authorized Recipient, carrying his or her own EBT card, would enter a retail store authorized by FNS to accept SNAP benefits. The Recipient would gather non-prepared food items that are eligible for purchase with SNAP benefits. The Recipient would present those items to the store clerk for purchase, along with his/her EBT card. The clerk would add the total cost of all items presented for purchase and enter that amount into the store's EBT terminal. The EBT card would then be "swiped" as is done with credit and ATM cards, the Recipient would enter a secret personal identification number, and, if the EBT card had a SNAP balance sufficient to cover the purchase total, the transaction would be completed. The total amount of the purchase would be electronically deducted from the Recipient's card balance. That same amount also would be electronically transferred to the retailer's designated bank account, using federal funds that originate from FNS.

12. As a result of my training and experience, I have become familiar with a number of schemes employed by individuals and entities to defraud SNAP. Sometimes retailers permit Recipients to purchase ineligible items with SNAP benefits, charging

Recipients a premium for allowing them to do so. Sometimes retailers permit Recipients to

run credit accounts, often involving ineligible items, and to pay off such accounts using

SNAP benefits and their EBT cards. Sometimes retailers exchange SNAP benefits for cash,

which as explained above, is known as trafficking.

        13.    Retailers who exchange SNAP benefits for cash usually do so at a

discounted rate, e.g., 50 to 70 percent of the full value of the SNAP benefits. For example, a

retailer engaging in trafficking would enter a $100 transaction against a Recipient's EBT

card balance and give the Recipient only $50 or $70 in cash, depending upon the discount

rate. This practice results in profiteering by traffickers, misuse of government funds

intended to provide food for needy families, and the creation of a market for stolen or

fraudulently obtained SNAP benefits.

        14.    Up until September 21, 2014, JP Morgan Chase was the EBT-

processing company in New York, responsible for EBT transactions and recordkeeping.

When JP Morgan Chase was the EBT-processing company, a retailer could obtain an EBT

terminal from JP Morgan Chase or from a third-party vendor. On or about September 21,

2014, Xerox State and Local Solutions, Inc. ("Xerox") became the EBT-processing company

in New York and has continued to serve as such through the present. A retailer may obtain

an EBT terminal from Xerox or from a third-party vendor. A retailer may obtain more than

one EBT terminal for a particular store, and each EBT terminal may be connected to a

separate bank account, even though it shares the same FNS authorization number. In a

typical transaction, an authorized retailer accepts SNAP benefits from a Recipient and,

through wire transfers from JP Morgan Chase (until September 21, 2014) or Xerox (from

September 21, 2014 through the present), receives dollar-for-dollar credit from USDA-

appropriated funds; if the retailer utilized an EBT terminal obtained from a third-party vendor, the retailer then remits a fee to the third-party vendor.

B.     The Defendants and Their Scheme

16.     Through the course of my investigation, I have learned that employees at King of Pulaski Deli, Inc., located at 333 Pulaski Street, Brooklyn, New York ("King of Pulaski Deli"), have been trafficking in SNAP benefits.

18.     Since August 2013, Special Agents of the USDA-OIG have been investigating King of Pulaski Deli and its owners, operators, and employees for possible violations of the SNAP EBT benefits program.   I reviewed the results of that investigation, which revealed that the defendants ALI NAGI and MELQUIADES EVARISTO GARCIA-AMBROCIO, individually and together with others, debited customers' SNAP EBT cards for an amount that purportedly represented the price of food and other eligible items purchased from King of Pulaski Deli.  In these exchanges for SNAP EBT benefits, the defendants ALI NAGI and MELQUIADES EVARISTO GARCIA-AMBROCIO generally gave cash to the customers in an amount that was approximately 60 percent less than the total value of the SNAP EBT benefits charged against the customer's EBT account.

19.     Based on information obtained from confidential informants and the observations of USDA-OIG agents, the defendants ALI NAGI and MELQUIADES EVARISTO GARCIA-AMBROCIO were employed and operated the cash register and EBT terminal at King of Pulaski Deli from at least September 2014 to the present.

20.     At different times between January 12, 2015 and September 11, 2015, two confidential informants ("CI-1" and "CI-2"), working under the direction of USDA-OIG agents, engaged in controlled SNAP transactions at King of Pulaski Deli.  Using undercover

8

EBT cards, CI-1 and CI-2 redeemed SNAP benefits in exchange for cash at a discounted rate. CI-1 and CI-2 were paid for their cooperation approximately $40-$50 each time they attempted to consummate an illegal SNAP benefits transaction under the direction of law enforcement. In my experience, both CI-1 and CI-2 have been reliable sources of information and have been cooperative in undercover investigations. CI-1 was formerly a clerk at a retailer who was arrested by USDA-OIG on charges associated with trafficking. CI-1 agreed to cooperate with USDA-OIG agents and was sentenced to a non-custodial sentence in connection with that case and remains on probation. To my knowledge, CI-1 has no other criminal history. To my knowledge, CI-2 has no criminal history.

21.     Employees of King of Pulaski Deli, specifically, the defendants ALI NAGI and MELQUIADES GARCIA-AMBROCIO, redeemed SNAP EBT benefits from CI-1 and CI-2 in exchange for cash at a discounted rate. Each of the transactions listed in paragraphs "a" through "h" below was recorded with the use of audio and video surveillance equipment. With respect to each of the transactions, before the confidential informant entered King of Pulaski Deli to conduct the transaction, USDA-OIG agents ensured that the confidential informant did not have any cash on his or her person. After each controlled transaction, the confidential informant surrendered to USDA-OIG agents the undercover EBT card, cash, and receipt(s) he or she received from the defendants ALI NAGI and MELQUIADES EVARISTO GARCIA-AMBROCIO. Based on interviews with CI-1 and CI-2 and my review of audio and video recordings of the controlled transactions, I know the following:

a.     January 12, 2015. CI-1 entered King of Pulaski Deli and approached the counter where ALI NAGI was working. CI-1 asked for a pack of cigarettes

and $20 cash in exchange for SNAP benefits.  ALI NAGI charged the undercover EBT card $31.29 and returned it to CI-1 along with the cigarettes, $20 cash and a receipt.

        b.        <u>January 22, 2015</u>.  CI-1 entered King of Pulaski Deli and approached the counter where ALI NAGI was working.  CI-1 asked for a pack of cigarettes and $20 cash in exchange for SNAP benefits.  ALI NAGI charged the undercover EBT card $41.25 and returned it to CI-1 along with the cigarettes, $20 cash and a receipt .

        c.        <u>February 13, 2015</u>.  CI-1 entered King of Pulaski Deli and approached the counter where ALI NAGI was working.  CI-1 asked for $20 cash in exchange for SNAP benefits.  ALI NAGI charged the undercover EBT card $30.29 and returned it along with the $20 cash and a receipt to CI-1.  CI-1 then asked ALI NAGI for a pack of cigarettes.  ALI NAGI charged the undercover EBT card $10.99 and returned it to CI-1 along with the cigarettes and a receipt.

        d.        <u>March 25, 2015</u>.  CI-1 entered King of Pulaski Deli and approached the counter where ALI NAGI was working.  CI-1 asked ALI NAGI how much he would charge in SNAP benefits for the return of $50 cash.  ALI NAGI stated, "You want fifty for you?  Eighty."  CI-1 then asked for a pack of cigarettes.  ALI NAGI charged the undercover EBT card $91.25 and returned it to CI-1 along with the cigarettes, $50 cash and a receipt.

        e.        <u>May 6, 2015</u>.  CI-1 entered King of Pulaski Deli and approached the counter where ALI NAGI was working.  CI-1 asked for a pack of cigarettes and $50 cash.  ALI NAGI charged the undercover EBT card $61.25 and returned it along with the cigarettes, $30 cash and a receipt.  CI-1 then told NAGI that he/she asked for "fifty

for me." ALI NAGI took back the undercover EBT card, charged it an additional $30.58 and returned it to CI-1 along with $20 cash and another receipt.

        f.      June 17, 2015. CI-2 entered King of Pulaski Deli and brought a water bottle to the counter where MELQUIADES EVARISTO GARCIA-AMBROCIO was working. In addition to purchasing the water bottle, CI-2 asked for $20 cash. MELQUIADES EVARISTO GARCIA-AMBROCIO charged the undercover EBT card $31.49 and returned it to CI-2 along with $20 cash and a receipt.

        g.      July 6, 2015. CI-2 entered King of Pulaski Deli and brought a beverage and other eligible items to the counter where MELQUIADES EVARISTO GARCIA-AMBROCIO was working. In addition to purchasing the items, CI-2 asked for $50 cash in exchange for SNAP benefits. MELQUIADES EVARISTO GARCIA-AMBROCIO charged the undercover EBT card $85.36 and returned it to CI-2, along with $50 cash and a receipt.

        h.      September 11, 2015. CI-2 entered King of Pulaski Deli and brought a beverage to the counter where ALI NAGI was working. In addition to purchasing the beverage, CI-2 asked for $20 cash in exchange for SNAP benefits. ALI NAGI charged the undercover EBT card $31.49 and returned it to CI-2, along with $20 cash and a receipt.

        22.      On or about September 24, 2014, USDA-OIG Special Agents executed a search warrant at King of Pulaski Deli. ALI NAGI and MELQUIADES EVARISTO GARCIA-AMBROCIO were present and provided photo identification. Based on the photo identification the defendants provided and a review of the video surveillance made during the undercover operations described above, I confirmed that the defendants ALI NAGI and

11

MELQUIADES EVARISTO GARCIA-AMBROCIO were the clerks working at the King of Pulaski Deli between January 12, 2015 and September 11, 2015.

23.     Based on my training and experience, I know that USDA classifies stores according to size, based upon a store's estimate or actual sales figures. King of Pulaski Deli is classified as a convenience store.

24.     I used USDA redemption data to compare the amount of SNAP benefits redeemed at King of Pulaski Deli during the time period October 1, 2014 through June 30, 2015 with other similarly-classified authorized retailers in the same geographical area. This comparison shows that during the period in question, the other authorized retailers redeemed on average between $988 and $26,972 a month while King of Pulaski Deli averaged approximately $66,546 a month. The authorized retailers averaged between $7.74 and $13.08 per transaction, in line with the average for all of New York State which was $9.61 during that same time period for the same classification of store. King of Pulaski Deli averaged $38.25 per transaction during this same time period.

25.     According to USDA records, King of Pulaski Deli redeemed a total of approximately $597,247 in SNAP benefits between October 1, 2014 and June 30, 2015. Of this total, King of Pulaski Deli redeemed approximately 82% or $486,964 in SNAP benefits in transactions over $50.

26.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application. I believe that sealing these documents is necessary because, given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the

target of the investigation to the existence of an investigation and likely lead to the

destruction and concealment of evidence and flight of the target.

    WHEREFORE, your deponent respectfully requests that a warrant issue for

the arrest of the defendants ALI NAGI and MELQUIADES EVARISTO GARCIA-

AMBROCIO so that they may be dealt with according to law.

    IT IS FURTHER REQUESTED that all papers submitted in support of this

application, including this complaint and affidavit, be sealed until further order of the Court.

Dated: Brooklyn, New York
    April 6 , 2016

                ELIZABETH GREANEY
                Special Agent, USDA-OIG

Sworn to before me on
the 6 day of April, 2016

THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK